IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 22, 2008 Session

## STATE OF TENNESSEE v. SENTORYA L. YOUNG

**Appeal from the Criminal Court for Davidson County**
**No. 2002-B-952     Mark J. Fishburn, Judge**

---

**No. M2005-01873-CCA-R3-CD - Filed May 12, 2008**

---

The Defendant, Sentorya L. Young, was convicted in the Davidson County Criminal Court of second degree murder and two counts of aggravated assault. He received an effective sentence of life without the possibility of parole as a repeat violent offender. Thereafter, he filed a petition for writ of error coram nobis, alleging that a prejudicial and extraneous piece of paper was sent to the jury room as substantive evidence. The trial court denied the petition. In this consolidated appeal,[1] he raises the following four issues for our review: (1) whether the evidence was sufficient to support his convictions; (2) whether the trial court failed to properly perform its role as thirteenth juror; (3) whether the trial court erred by allowing the prosecutor to express a personal opinion through the admission of a chart; and (4) whether the trial court erred in denying his writ of error coram nobis petition. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Emma Rae Tennent, Assistant Public Defender, Nashville, Tennessee, for the appellant, Sentorya L. Young.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Renee Erb, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] On August 2, 2006, this Court stayed the Defendant's direct appeal from his convictions and ordered that any appeal from the trial court's ruling on the error coram nobis petition be consolidated with the stayed appeal. Both appeals are now consolidated for our review.

## OPINION

### Factual Background

This case arises from an altercation occurring in front of a Comfort Inn hotel room in Hermitage. During the early morning hours of January 23, 2002, the Defendant shot at three men, Torey Pillow, Aaron "Shawn" Pillow, and Wayne Robison.[2] As a result, a Davidson County grand jury indicted the Defendant for second degree murder (Torey Pillow) and two counts of aggravated assault (Shawn Pillow and Wayne Robison). See Tenn. Code Ann. §§ 39-13-102, -210 (defining the offenses of second degree murder and aggravated assault). A jury trial was held in December of 2004.

### *Trial*

Viewing the evidence in the light most favorable to the State, the proof at trial showed that, on the evening of January 22, 2002, Shawn Pillow had rented a hotel room at the Comfort Inn in Hermitage. At some point in the evening, the Defendant and David Clark arrived at the hotel room. The Defendant was driving a silver Pontiac. Torey Pillow, Shawn Pillow's brother, picked up Wayne Robison in his maroon Buick, and they joined the group at a strip club. The Defendant, David Clark, Shawn Pillow, Torey Pillow, Chris Grizzard, and Wayne Robison were all in attendance at the club.

While at the club, David Clark gave his phone number to one of the strippers. Thereafter, the group left and went to another strip club, but it was closed. While the group was in the parking lot of the second strip club, the woman to whom Clark had given his number telephoned. The group met up with the two women, Chithantkia Fisher and Denita Smith.

All these individuals then returned to Shawn's hotel room. Torey Pillow dropped off his passengers and left. The women agreed to provide sex to the remaining men for $250.

Torey returned in the early morning hours to pick up his brother and Robison. Shawn and Robison got in the car with Torey, and they left the hotel. One of the women had noticed that her money was missing from her pants. Grizzard called the three men inquiring about the missing money. The Pillows and Robison returned to the hotel and began arguing with Grizzard about the missing cash. Grizzard was demanding compensation and accused Robison of "cockin' a strap," or cocking his pistol. In order to show that the gun was not cocked, Robison raised his hands and said "I ain't doin' nothing." The Defendant then approached the passenger's side of the vehicle and began firing. Shawn Pillow and Wayne Robison testified that they saw the Defendant fire first. Shawn then returned fire at the Defendant.

Torey Pillow died as a result of a gunshot wound to the head. Wayne Robison was shot in his thigh, and Shawn Pillow was shot in the stomach.

---

[2] The victim's name appears as Robinson in the indictment and in other portions of the record. However, it appears that the correct spelling is Robison.

Following the conclusion of the proof, the jury found the Defendant guilty as charged. He received an effective sentence of life without the possibility of parole as a repeat violent offender. See Tenn. Code Ann. § 40-35-120. The Defendant filed a motion for new trial, which was denied by written order on June 28, 2005.

***Coram Nobis Proceeding***

On June 23, 2006, the Defendant filed a petition for writ of error coram nobis, arguing that the trial court should grant him relief on the basis of newly discovered evidence in the form of an extraneous and prejudicial chart that went to the jury room during deliberations. The Defendant's counsel was reviewing the record on appeal and noticed a large chart created by the prosecutor during her direct examination of David Clark, which was not labeled as an exhibit. The chart reflected the inconsistencies in Clark's various statements regarding who shot first and the time frames in which those statements were made. The Defendant contends that this extraneous, prejudicial document went to the jury room and that, if the trial court had known of the document's presence in the jury room, there was a reasonable probability a mistrial would have been granted. Thereafter, a hearing was held on the request for coram nobis relief.

Nicole Murphy, a clerk with the Davidson County Criminal Court Clerk's Office, testified that, when she was preparing the record to send to the Appellate Court Clerk's Office, she found exhibit 7 (a diagram of the scene created by David Clark) "that had a piece of paper folded inside of it that wasn't marked." She admitted that she did not alert anyone to the presence of the document. Matt Lockridge, also an employee of the Davidson County Criminal Court Clerk's Office testified that, as a part of his duties, he checked items into the clerk's office property room. He did not recall the document in question and stated that, if he had seen the document in the record, he would have alerted someone to its presence.

Aaron Gray, the trial judge's "in-court clerk," testified that his responsibilities included documenting all exhibits during a trial and compiling an exhibit list. He commented that this case was tried twice and that the documents were not renumbered from the first trial. According to Mr. Gray, any document marked for identification purposes only did not go to the jury room. Mr. Gray testified that, while he did not have any specific recollection of this case, there was a standard procedure in place to prevent "ID Only" exhibits from going to the jury room and "we don't deviate from that procedure."

Mr. Gray acknowledged that there was no mention of this chart on the exhibit list. He further opined that the exhibit was not viewed by the jury during its deliberations. When asked if an error occurred by this document's presence in the property room, Mr. Gray admitted that its presence in the record was a "mistake."

Next, Chris Austin, the trial judge's court officer, testified and described his responsibilities as overseeing courtroom proceedings. He stated that, as a part of his responsibilities, he examined the exhibits at the conclusion of a trial and made sure that only exhibits identified and accepted into evidence went into the jury room. When asked if he had any specific recollection of this case and

this exhibit, he responded, "What I can say is me and Mr. Gray followed the procedure, but I know that when I brought the exhibits back that was not a piece of it or I would've made someone aware of it." He testified that he gathered the exhibits from the jury room at the conclusion of trial, compared them with the exhibit list, and then took them to the property room.

Emma Rae Tennent of the Metropolitan Nashville Public Defender's Officer testified that she represented the Defendant on his appeal in this case. She testified that she inspected the record on appeal and discovered the chart "[f]olded up inside" of exhibit number 7. She determined from the trial transcript that the chart was made during the course of David Clark's testimony because the chart tracked various portions of his testimony. Ms. Tenant acknowledged that the closing statements were not transcribed.

Robert J. Windell testified that he was an unpaid intern in the public defender's office and that he participated in interviewing the twelve jurors in this case. He stated that each juror was shown a copy of the unmarked chart and of exhibit 7 and were asked if they recalled these documents.

Daniel Jones testified that he was a juror in this matter. He stated defense counsel visited him and showed him two documents (the unmarked chart and exhibit 7). Mr. Jones remembered the unmarked chart "vividly." When asked when he had previously viewed the document, he answered, "I know I've viewed it in the courtroom and I believe it may have been in the jury room as well, yes." He stated that he was between "80 and 90 percent certain" that he saw the document in the jury room. He could not recall whether the document was discussed by the jury during its deliberations.

Bernie Lynch, also a juror in this case, testified that he recalled seeing the unmarked chart during jury deliberations. When asked if he remembered whether the document was discussed by the jurors, he responded, "Oh, I'm sure it was. I mean, because—I mean, we talked about just about everything that was in there." On cross-examination, his testimony became somewhat equivocal on whether the document was actually present in the jury room or was just discussed during deliberations.

After hearing testimony, the trial court entered an extensive order denying the Defendant coram nobis relief. The case is now properly before this Court.

**ANALYSIS**

**I. Sufficiency of the Evidence**

The Defendant's first issue is whether the evidence is legally sufficient to support his convictions for second degree murder and aggravated assault. Specifically, the Defendant argues that the evidence is not sufficient because he acted in self-defense and in defense of another. In the alternative, he argues that he killed the victim during a state of passion produced by adequate provocation and, thus, the evidence warrants a conviction for voluntary manslaughter instead of second degree murder.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Second degree murder is defined by statute as the "knowing killing of another." See Tenn. Code Ann. § 39-13-210(a)(1). The lesser charge of voluntary manslaughter also includes the "knowing killing of another," but adds the additional element that the killing was done "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Aggravated assault, as charged in this case, is committed when a person intentionally or knowingly causes bodily injury to another and uses or displays a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B).

A person acts knowingly when, with respect to a result of the person's conduct, "the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). A person's action may be knowing, irrespective of that person's desire that the conduct or result will occur. Tenn. Code Ann. § 39-13-102, Sentencing Commission Comments.

The Defendant argues that the State failed to negate his theory of self-defense or defense of another beyond a reasonable doubt. He does not contest that he shot the victims, but he asserts that he did so in defense of himself and Grizzard after Robison "cocked his gun." Thus, he argues that the killing was legally justified.

Tennessee Code Annotated section 39-11-611(a) provides as follows:

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a). Defense of a third person is set forth in Tennessee Code Annotated section 39-11-612:

A person is justified in threatening or using force against another to protect a third person, if:

(1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and

(2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. § 39-11-612.

It is well settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the trier of fact. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). As such, "in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." Clifton, 880 S.W.2d at 743. Moreover, the State has the burden of negating any defense if admissible evidence is introduced supporting the defense. Tenn. Code Ann. § 39-11-201(a)(3). It is clearly within the prerogative of the jury to reject a claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). The right to defend a third person is to be determined in the same fashion as the right of self-defense. Tenn. Code Ann. § 39-11-612, Sentencing Commission Comments.

The Defendant asserts that, based upon the evidence of self-defense or defense of another presented at trial, he was legally justified in shooting the victims. He notes that, "from the testimony of the four prosecution witnesses, . . . no coherent account emerges concerning several material facts, such as the timing of the shooting, Chris Grizzard's location immediately prior to the shooting, whether Wayne Robison had his gun cocked, and who shot first." He further points to the facts that he was not initially involved in the dispute about the stolen money and that he was aware that

-6-

Robison and Shawn Pillow were armed. Alternatively, he argues that the evidence supports, at best, a conviction for voluntary manslaughter.

In this case, the Defendant's sufficiency argument is based upon witness' credibility. Examining the evidence in the light most favorable to the State, we conclude that there was sufficient evidence to sustain the Defendant's convictions for second degree murder and aggravated assault. The proof showed that, following an argument between Grizzard and Robison, the Defendant approached the vehicle and began firing. According to testimony presented at trial, Robison had previously shown his empty hands, indicating that he did not intend to fire a weapon. The jury heard testimony from two eyewitnesses that the Defendant was the one who fired first. There was also testimony from one witness that he did not. As noted above, this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236. Furthermore, questions about the credibility of witnesses, the weight and value of the evidence, as well as factual issues raised by the evidence are to be resolved by the trier of fact. Id.

The jury was not obligated to accept the Defendant's testimony as to self-defense. The issue of self-defense in a murder prosecution is always a question of fact to be determined by the trier of fact. In summary, there was ample evidence to support the jury's finding in this case that the Defendant "knowingly" killed one victim and fired upon the other two. We conclude that the State did negate the Defendant's theory of self-defense and that the evidence was sufficient to establish the certainty of guilt of the accused.

Regarding the Defendant's argument that the evidence supports only a conviction for voluntary manslaughter, it was a question for the jury whether the Defendant knowingly committed second degree murder or whether he acted under "adequate provocation." State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). The jury was under no obligation to accept the Defendant's contentions that the killing was committed in a state of passion. A reasonable jury could have justifiably found that the provocation suffered by the Defendant was inadequate. In any event, that decision, made under proper instructions and consideration of all the evidence, is within the exclusive province of the jury. There was ample evidence to support the jury's verdict of second degree murder.

The Defendant argues that the jury instructions for second degree murder and voluntary manslaughter should have been reversed as he requested. In a similar case, this Court recently agreed that binding precedent allows the use of an instruction for sequential consideration of the homicide grades. See State v. Earnest Gwen Humphrey, No. M2003-01489-CCA-R3-CD, 2005 WL 2043778, at *14-15 (Tenn. Crim. App., Nashville, Aug. 24, 2005); see also State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997) (appendix). This Court has observed that, though not required, the Tennessee Pattern Jury Instruction's approach—the instruction dealing with second degree murder should also advise the jury relative to the issue of passion upon adequate provocation relative to voluntary manslaughter—is more desirable. See State v. Jerry Dale Tigner, Jr., No. W2004-01935-CCA-R3-CD, 2005 WL 2259252, at *6 (Tenn. Crim. App., Jackson, Sept. 15, 2005). However, this Court has recently affirmed a conviction for second degree murder in a case involving

jury instructions that were similar to those given in this case.  See State v. Walfrido L. Rodriguez, No. M2005-01351-CCA-R3-CD, 2006 WL 1626845, at *3-4 (Tenn. Crim. App., Nashville, June 7, 2006), perm. to appeal denied, (Tenn. Oct. 30, 2006).  Prior to their deliberations, the jury in this case was fully and accurately instructed concerning provocation, passion, and the difference between second degree murder and voluntary manslaughter.  See State v. Billy Joe Welch, No. E2005-02293-CCA-R3-CD, 2006 WL 2737830, at *14 (Tenn. Crim. App., Knoxville,  Sept. 26, 2006), perm. to appeal denied, (Tenn. Feb. 26, 2007).  The present case does not compel relief.

## II.  Thirteenth Juror

Next, the Defendant contends that the trial court failed to appropriately exercise its role as thirteenth juror:

> [T]he trial court abdicated its duty as thirteenth juror to independently weigh the evidence and assess the credibility of the witnesses.  The trial court instead deferred completely to the jury's determinations, and indicated through its comments on the record . . . that it misunderstood its authority and responsibility to act as thirteenth juror.

The Defendant requests a new trial.

Tennessee Rule of Criminal Procedure 33(d)[3] imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case.  State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995).  Rule 33(d) does not require the trial judge to make an explicit statement on the record.  See Tenn. R. Crim. P. 33(d).  Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict.  Carter, 896 S.W.2s at 122.  Only if the record contains statements by the trial judge indicating disagreement with the jury's verdict or evidencing the trial judge's refusal to act as the thirteenth juror, may an appellate court reverse the trial court's judgment.  Id.  Otherwise, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure.  State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993).  If the reviewing court finds that the trial judge has failed to fulfill his or her role as thirteenth juror, the reviewing court must grant a new trial.  State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

At the conclusion of the hearing on the motion for a new trial, the trial judge stated his findings on this issue as follows:

> No, I'm going to issue just a little written order.  As to the [issues] that were actually argued today, Mr. Robinson (sic), there was inconsistent testimony on

---

[3]  We note that the Tennessee Rules of Criminal Procedure were revised on July 1, 2006.  See Compiler's Notes, Tenn. R.Crim. P. (2006).  These revisions made some slight language changes to the sections cited herein.  For purposes of this opinion, because the substance of the rule under review has not changed, we will cite to the rule in its current form.

whether the gun, and I'll go through that when I give it, but there was two different, one person had the gun inside the vehicle, Mr. Robinson (sic) did not. It never broached the plane of where the window would have been, had it come up, but it was at the window. One of the other witnesses testified that the hand was actually inside, and then there was some confusion possibly even on that, and I'm going to refresh my memory through my notes on that.

As to the second degree murder and the provocation, in acting as 13th juror, I felt that that, and still feel that that was a jury question. There was differences in testimony as to how quickly after this statement was made about "cockin' your strap," the shooting occurred anywhere from a minute or so up to eight minutes, and I think it was absolutely up to the jury to determine whether or not the delay between that statement and the actual shooting in effect offset any provocation that they thought may have been a of [sic] it. So, I don't think that the two [issues] that were argued today have merit and I'll respectfully deny those . . . .

Thereafter, the trial court entered an order denying the motion for new trial, simply stating that "the [c]ourt finds no grounds on which a new trial should be granted."

The Defendant relies on State v. Ruby Breeden, No. E2004-01512-CCA-R3-CD, 2005 WL 3199280 (Tenn. Crim. App., Knoxville, Nov. 30, 2005), in support of his contention that the trial judge abdicated his responsibility as the thirteenth juror. The trial court in Breeden made the following comments, in releveant part, after the defendant moved for a new trial:

Looking at the sufficiency of the evidence, I think, if I'm not mistaken, someone talked about 13rth juror and I've thought about that for some time. It's just simply not the law in this State, the Judge is not 13th juror. I'm to weigh—I'm to weigh the sufficiency of the evidence and not step in and play the extra juror and take the case basically.

2005 WL 3199280, at *5. Based upon the trial court's pronouncements in that case, this Court concluded that the trial court failed to act as thirteenth juror because the court was under the mistaken impression that it "was not to serve as the thirteenth juror at all, . . . but rather to defer to the verdict of the jury without weighing the evidence." Id. at *7.

This case differs procedurally from Breeden in that the trial court herein specifically stated that it was "acting as 13th juror" and, thereafter, denied the Defendant's motion for a new trial. Moreover, the trial court was addressing two issues at the motion for new trial hearing—the Defendant's insufficient evidence claim and his thirteenth juror claim. Some of the statements made by the trial court were relevant to the sufficiency analysis and some were relevant to the thirteenth juror analysis. See State v. Jerry Breeding, No. M2001-00043-CCA-R3-CD, 2002 WL 122931, at *11 (Tenn. Crim. App., Nashville, May 6, 2002).

We find the facts of this case to be akin to those presented in State v. Robert Warren Tillman, No. M2006-01716-CCA-R3-CD, 2008 WL 1705062 (Tenn. Crim. App., Nashville, Apr. 14, 2008). See also Breeding, 2002 WL 122931, at 10-*11. In Tillman, the trial court made the following statements at the motion for new trial hearing:

> The [c]ourt believes that this was truly a classic case where a jury question was presented. We had the prosecution's case and we had the defense's case, and the jury sided, essentially, with both, in that it found the defendant guilty on certain counts and not guilty on other counts. So it was clearly a jury question, and the [c]ourt believes that the evidence was sufficient that had been presented to the jury for it to render its verdict.

Tillman, 2008 WL 1705062, at *6. This Court concluded that the trial court in Tillman had fulfilled its role as thirteenth juror by approving the verdict and denying the motion for a new trial: "The record [did] not reflect that the trial court, at any time, disagreed with the jury's verdict." Id.

Contrary to the Defendant's contentions, we find nothing in the trial judge's statements to indicate that he was not satisfied with the verdict or that he failed to weigh and consider all of the evidence. Accordingly, the Defendant is not entitled to relief on this issue.

## III. Chart

As his third issue, the Defendant argues that "the trial court erred by permitting the prosecutor to, in effect, testify through expert witness Kendall Jaeger by telling him what to write in a chart that was sent to the jury room as an exhibit." The Defendant relies on State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999), for the proposition that the statements made by the prosecutor during Officer Jaeger's direct examination amounted to an expression of her personal opinion about the veracity of previous State's witnesses.

Officer Jaeger, testifying as an expert in firearm tool mark identification, stated that he examined the evidence in this case and prepared a report detailing his findings. During his direct examination, the prosecutor instructed Officer Jaeger to construct a three-page chart, explaining the purpose of the chart as follows:

> Now, because there are so many different numbers involved, I want you to just explain the various—other officers have explained their part of the system, but we need to explain to the jury how it all fits together so you know what is what, where it came from and what it has to do with the case.

In essence, the chart documented Officer Jaeger's findings detailed in his report and correlated those findings with the physical evidence presented in the case.

Following the creation of the chart, defense counsel objected. The following colloquy then occurred:

[DEFENSE COUNSEL]: Your Honor, I actually wrote down some of the things this witness said about how he didn't know whose gun was whose, he didn't know where it was recovered. When [the prosecutor] made a mistake in what she was telling him to write, he wrote down her mistake, and she had to say, "Oh, I made a mistake." Exhibits aren't supposed to be the testimony of the prosecutor going back into the [jury] room. This witness has very obediently written down what she has told him to write down, but it's not his work. I strongly object to it going back to the jury room. We can't have [the prosecutor's] statements back in the jury room with the jury.

[PROSECUTOR]: Well, each of these items—

[DEFENSE COUNSEL]: His report will certainly go back and that's up to them to decipher.

[PROSECUTOR]: His report, no one can decipher it, because as he said, he doesn't use—everything that he wrote down was from the bags that they were written on and the officers, for example, Officer Matthews is the easiest one, he testified, like, "Bag number one goes with this. Bag number three goes with that. Number four goes with that."

THE COURT: Yes, he was doing all that up until the last page or so and then you were kind of telling him.

. . . .

THE COURT: No, so I really need to look at it. During the first couple of pages anyway, that I can determine, he was identifying the bag from which it came from and then looked at his notes. He would say "Item number eight," then he would give his personal code, and then he would relate it to exhibit number, and then he would give his opinion as to what that was and what his conclusions were when he examined it. Towards the end, it kind of changed, I agree with that, but I'll have to look at it exactly.

At the conclusion of the State's proof, the issue was again addressed by the parties. The following exchange took place:

[DEFENSE COUNSEL]: To cut it shorter, Your Honor, actually on this example, I was objecting to [the copper jacket] [sic] than I am [the Defendant's] gun, he doesn't know whose gun it was. He can say it's from the Jennings Bryco (phonetic).

-11-

[PROSECUTOR]: You have to be able to keep the stuff straight some kind of way.

THE COURT: Another officer has already identified that particular weapon being the one that was taken from [the Defendant].

[DEFENSE COUNSEL]: Not this witness.

THE COURT: Well, no, but did you expect him to testify from the very beginning that he pulled him over out on Rollin's Market?

[DEFENSE COUNSEL]: No, sir.

THE COURT: We just spent a day-and-a-half on chain of custody. The chain of custody has been established and I am not going to make them, this officer back here, Jaeger, reestablish a chain of custody. I mean, he had—we know what that weapon was and who it belonged to.

[DEFENSE COUNSEL]: I'm not asking for chain of custody to be gone into. I'm asking for the exhibit from this officer's testimony to reflect what this officer actually knew, not what other officers testified to, not what other people knew, that's all I'm asking for. He doesn't know whose gun is whose. He can label which gun it came from and he didn't.

THE COURT: Overruled. The last page is to be taken out.

Ultimately, the trial court disallowed the third page of the chart, and the first two pages were admitted as exhibits and used by the jury in its deliberations. Officer Jaeger's report was also admitted into evidence.

Defense counsel's objection in the trial court was based upon the exhibit going to the jury room rather than misconduct by the prosecutor. Defense counsel did not move for a mistrial. On appeal, the Defendant asserts that the prosecutor improperly commented on the credibility of the State's witnesses during its examination of Kendall Jaeger and that a new trial is warranted. He points to the facts that the prosecutor directed the wording used on the chart and that Officer Jaeger had no personal knowledge about some matters listed on the chart. Irregardless of possible waiver, we conclude that either argument of the Defendant—improper comments by the prosecutor or the presence of the exhibit during jury deliberations—is without merit.

The Defendant's reliance on Thornton, 10 S.W.3d 229, is misplaced. In Thornton, this Court ruled that comments by a prosecutor that he was "very proud" of the crime lab and that "they do an excellent job" was improper argument. 10 S.W.3d at 235. Here, the prosecutor's statements made during the creation of the chart did not amount to vouching for previous testimony of State's

witnesses.  See generally State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (discussing the five general areas of prosecutorial misconduct).  The prosecutor was doing nothing more than accurately summarizing the evidence previously admitted in this case.  The chart was simply created to aid the jury in analyzing the evidence; it was a demonstrative exhibit.

In this regard, "[d]emonstrative evidence is admissible only if relevant under Tennessee Rule of Evidence 401."  Ronald Bradford Waller v. Sate, No. E1999-02034-CCA-R3-PC, 2000 WL 982103, at *15 (Tenn. Crim. App., Knoxville, July 18, 2000).  In other words, demonstrative evidence should "assist the trier of fact in understanding and evaluating the other evidence offered at trial."  Id. (citation omitted).  Moreover, "[d]emonstrative evidence is . . . often attacked . . . on grounds that it is too prejudicial under Rule 403."  Id.  The admission of demonstrative exhibits is within the discretion of the trial judge, and that discretion will not be disturbed absent a clear showing of abuse.  State v. West, 767 S.W.2d 387, 402 (Tenn. 1989).

The matters contained in the chart were in evidence, relevant to issues in the trial, and were not overly prejudicial.  We conclude that the trial court did not abuse its discretion by allowing the jury to use the chart during deliberations.  Even if error is assumed, the jury was instructed that it should base its decision on the proof offered at trial, not the arguments of counsel, and the evidence of the Defendant's guilt of the offenses was more than sufficient.  The Defendant has failed to show he was prejudiced by the comments, and any error is harmless.

## IV.  Writ of Error Coram Nobis

As his final issue, the Defendant argues that the trial court erred in denying his petition for writ of error coram nobis.  On appeal, the Defendant argues that he is entitled to error coram nobis relief because, through no fault of his own, "a prejudicial and extraneous piece of paper measuring 27" by 33" and captioned in red with the State's theory of the case was improperly sent to the jury room as substantive evidence for consideration by the jury."  He contends that a new trial should be granted.

A writ of error coram nobis is available to a defendant in a criminal prosecution.  Tennessee Code Annotated section 40-26-105 provides, in pertinent part, as follows:

(b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding.  Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

-13-

(c) The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). "The purpose of this remedy is to bring to the attention of the court some fact unknown to the court which if known would have resulted in a different judgment." Freshwater v. State, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004) (quoting State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995)). The decision to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. Tenn. Code Ann. § 40-26-105; Hart, 911 S.W.2d at 375.

To establish that he is entitled to a new trial, the Defendant must show the following: (a) the grounds and the nature of the newly discovered evidence; (b) why the admissibility of the newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial; (c) that the Defendant was without fault in failing to present the newly discovered evidence at the appropriate time; and (d) the relief sought. Freshwater, 160 S.W.3d at 553; Hart, 911 S.W.2d at 374-75.

> The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories, as are the grounds for reopening a post-conviction petition. Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time.

Harris v. State, 102 S.W.3d 587, 592-93 (Tenn.2003). To be successful on a petition for a writ of error coram nobis, our supreme court recently held that "the standard to be applied is whether the new evidence, if presented to the jury, may have resulted in a different outcome . . . ." State v. Vasques, 221 S.W.3d 514, 526 (Tenn. 2007).

The Defendant cites to State v. Malinda L. Mason, No. M2005-01961-CCA-RM-CD, 2005 WL 3038612 (Tenn. Crim. App., Nashville, Nov. 10, 2005), to support his argument that the jury was exposed to extraneous information and a new trial is warranted. According to the Defendant's allegations, the newly discovered evidence is a poster-size document summarizing the testimony of an eyewitness who gave inconsistent accounts of who shot first in this homicide case. In Mason, this Court made the following statement: "It would be hard to conclude under any scenario that a written summary of any prosecution witness's testimony, not made an exhibit, and presented to a jury during deliberations, would not be prejudicial." 2005 WL 3038612, at *4.

The trial court noted that the initial inquiry is whether the jury was actually exposed to the information. It is well-settled law that, "when it has been shown that a juror was exposed to

extraneous prejudicial information or subjected to improper influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or demonstrate that it was harmless." Walsh v. State, 166 S.W.3d 641, 647 (Tenn. 2005). The trial court recounted the testimony given at the coram nobis hearing and concluded, "[T]he Court is not satisfied that [the Defendant] has carried his burden that [the unmarked chart] or the 'non-exhibit' was viewed by the jury during deliberations . . . ." The court gave several reasons in support of its opinion: that there were multiple safeguards in place to prevent the submission of extraneous information to the jury, that there was a significant likelihood of discovery of any mistake, that Mr. Lockridge signed the exhibit list as accurately describing all exhibits submitted to him, and that the jurors' testimony was not corroborated by the other jurors.

The trial court, assuming arguendo that the document was viewed by the jury, also stated, "[T]his [c]ourt finds no evidence to support the proposition that the inclusion of the non-exhibit during jury deliberations may have affected the judgment in this case." The trial court distinguished the Mason case, correctly reasoning that, in this case,

> the extraneous information was created by the assistant district attorney in open court in front of the jury representing a synopsis of the witness' testimony given in open court in front of the jury. . . . There is nothing extraneous about what was contained in the document and no inference could be drawn that any of the information was endorsed by the district attorney general or the Davidson County Grand Jury.

The trial court further differentiated this case from Mason, stating as follows:

> In this case, the notations on the document addressed the credibility of the witness actually testifying. . . . Unlike Mason, this summary of the prosecuting witness' testimony is not corroborative of other testimony. In fact, it contradicts the testimony of other eyewitnesses and, therefore, is favorable to [the Defendant], if the jury elected to accept this testimony after weighing his credibility.

Addressing the Defendant's assertion that the document memorialized the State's theory of the case, the trial court found, "If it did, then the jury's only logical conclusion would be that the State doesn't know what happened." As also noted by the trial court, if the Defendant believed the document to be inaccurate, then the Defendant could have objected. Again, we note that the jury was instructed that it should base its decision on the proof offered at trial, not the arguments of counsel.

The Defendant contends that, "had the error been discovered prior to the verdict, the trial court would have had an opportunity to consider whether a curative instruction would suffice to protect the [D]efendant's rights, or whether a mistrial was required." The trial court determined, "It is not the consideration of a mistrial that is relevant. That is obligatory. The issue is whether the mistrial was a reasonably legitimate consideration, which it was not in this case." The trial court also discussed the evidence presented at trial and stated that "[t]he document did not bring to the juries

-15-

[sic] attention evidence not otherwise presented to them. They heard that evidence and rendered their verdict on that evidence."

To the extent that the Defendant raises a cognizable claim under the error coram nobis statute, the Defendant has failed to establish that the subsequently or newly discovered evidence might have resulted in a different judgment had it been presented at the trial. We agree with the rationale provided by the trial court in its extensive and thorough order. We conclude that the trial court did not err or abuse his discretion by denying the petition.

**CONCLUSION**

Based on our review of the record, the parties' briefs, and the applicable law, we conclude that the evidence was sufficient to support the Defendant's convictions beyond a reasonable doubt, that the trial court fulfilled its responsibility as thirteenth juror, and that trial court did not abuse its discretion by admitting the chart created by Officer Jaeger. We further conclude that the trial court properly denied the Defendant's petition for writ of error coram nobis. Accordingly, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE